**IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION**

| | | |
|---|---|---|
| **LEA ELMALECH** | ) | |
| | ) | |
| Plaintiff, | ) | Case No. 17 C 8606 |
| | ) | |
| v. | ) | |
| | ) | |
| **NANCY BERRYHILL,** | ) | Magistrate Judge Daniel G. Martin |
| Acting Commissioner of Social | ) | |
| Security, | ) | |
| | ) | |
| Defendant. | ) | |

## MEMORANDUM OPINION AND ORDER

Plaintiff Lea Elmalech ("Plaintiff" or "Elmalech") seeks judicial review of a final decision of Defendant Nancy Berryhill, the Acting Commissioner of Social Security ("Commissioner"). The Commissioner denied Plaintiff's application for disability insurance benefits in a September 13, 2016 written decision of an Administrative Law Judge ("ALJ"). Elmalech appealed the ruling to this Court and filed a Motion for Summary Judgment that seeks to reverse the Commissioner's decision. The Commissioner filed a cross-motion. The Court has carefully reviewed the extensive administrative record but omits a detailed description of it except as necessary to address the parties' primary concerns. Elmalech originally filed for disability insurance benefits on January 18, 2007, alleging an onset date of June 1, 1993. This is her third challenge in federal court to an unfavorable ALJ decision. For the reasons discussed below, Plaintiff's motion is granted, and the Commissioner's motion is denied.

## I. Legal Standard

### A. The Social Security Administration Standard

In order to qualify for disability benefits, a claimant must demonstrate that he is disabled. An individual does so by showing that he cannot "engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months." 42 U.S.C. § 4243(d)(1)(A). Gainful activity is defined as "the kind of work usually done for pay or profit, whether or not a profit is realized." 20 C.F.R. § 404.1572(b).

The Social Security Administration ("SSA") applies a five-step analysis to disability claims. *See* 20 C.F.R. § 404.1520. The SSA first considers whether the claimant has engaged in substantial gainful activity during the claimed period of disability. 20 C.F.R. § 404.1520(a)(4)(I). It then determines at Step 2 whether the claimant's physical or mental impairment is severe and meets the twelve-month durational requirement noted above. 20 C.F.R. § 404.1520(a)(4)(ii). At Step 3, the SSA compares the impairment (or combination of impairments) found at Step 2 to a list of impairments identified in the regulations ("the Listings"). The specific criteria that must be met to satisfy a Listing are described in Appendix 1 of the regulations. *See* 20 C.F.R. Pt. 404, Subpt. P, App. 1. If the claimant's impairments meet or "medically equal" a Listing, the individual is considered to be disabled, and the analysis concludes; if a Listing is not met, the analysis proceeds to Step 4. 20 C.F.R. § 404.1520(a)(4)(iii).

Before addressing the fourth step, the SSA must assess a claimant's residual

functional capacity ("RFC"), which defines his exertional and non-exertional capacity to work. The SSA then determines at the fourth step whether the claimant is able to engage in any of his past relevant work. 20 C.F.R. § 404.1520(a)(4)(iv). If the claimant can do so, he is not disabled. *Id.* If the claimant cannot undertake past work, the SSA proceeds to Step 5 to determine whether a substantial number of jobs exist that the claimant can perform in light of his RFC, age, education, and work experience. An individual is not disabled if he can do work that is available under this standard. 20 C.F.R. § 404.1520(a)(4)(v).

**B.    Standard of Review**

A claimant who is found to be "not disabled" may challenge the Commissioner's final decision in federal court. Judicial review of an ALJ's decision is governed by 42 U.S.C. § 405(g), which provides that "[t]he findings of the Commissioner of Social Security as to any fact, if supported by substantial evidence, shall be conclusive." 42 U.S.C. § 405(g). Substantial evidence is "such evidence as a reasonable mind might accept as adequate to support a conclusion." *Richardson v. Perales*, 402 U.S. 389, 401 (1971). A court reviews the entire record, but it does not displace the ALJ's judgment by reweighing the facts or by making independent credibility determinations. *Elder v. Astrue*, 529 F.3d 408, 413 (7th Cir. 2008). Instead, the court looks at whether the ALJ articulated an "accurate and logical bridge" from the evidence to her conclusions. *Craft v. Astrue*, 539 F.3d 668, 673 (7th Cir. 2008). This requirement is designed to allow a reviewing court to "assess the validity of the agency's ultimate findings and afford a claimant meaningful judicial review." *Scott v. Barnhart*, 297 F.3d 589, 595 (7th Cir. 2002). Thus, even if reasonable minds could

differ as to whether the claimant is disabled, courts will affirm a decision if the ALJ's opinion is adequately explained and supported by substantial evidence. *Elder*, 529 F.3d at 413 (citation omitted).

### C.    The ALJ's Decision

The ALJ applied the familiar five-step analysis to find at Step 1 that Elmalech had not engaged in substantial gainful activity between the alleged onset date of June 1, 1993 and her last date insured on June 30, 1995. Her severe impairments at Step 2 were obesity and a history of chronic dizziness. Neither of these impairments met or equaled a listing at Step 3, either singly or in combination. Before moving to Step 4, the ALJ considered Elmalech's allegations concerning the severity and frequency of her impairments, finding that they were not supported by the objective record. The ALJ also formulated an RFC for Plaintiff. She found that Elmalech could carry out light work with various exertional and non-exertional restrictions. The ALJ then found at Step 4 that Elmalech was not able to perform her past relevant work. Relying on the testimony of a vocational expert, the ALJ found at Step 5 that jobs existed in the national economy that an individual with Elmalech's RFC could perform. She therefore concluded that Plaintiff was not disabled.

## II.    Discussion

Elmalech claims that the ALJ erred by (1) incorrectly explaining why the ALJ did not accept Elmalech's statements about her condition, and (2) assessing an RFC that is not supported by substantial evidence. These claims are familiar topics in disability cases. The issues surrounding the claims presented here, however, are anything but routine. The

story is a dismal one that challenges even the most ardent believer's faith in the Social Security disability system. This is Elmalech's third appearance in federal court related to claims that she was disabled between 1993 and 1995. The first ALJ's decision was issued ten years ago on October 1, 2008. In a rambling written opinion, the earlier ALJ found that Elmalech had four severe impairments – a history of dizziness, a vestibular dysfunction, diabetes, and glaucoma. (R. 18). The RFC in this first decision was largely the same as it currently stands: Plaintiff could carry out light work with various exertional and non-exertional restrictions. (R. 18-19). Elmalech appealed the ALJ's finding to federal court, and Magistrate Judge Michael Mason remanded it for further review. *Elmalech v. Astrue*, 2011 WL 2415010 (N.D. Ill. June 10, 2011).

The ALJ issued a second unfavorable decision on September 27, 2013, assessing the same severe impairments as before and an almost identical RFC. (R. 496-504). This time, though, the ALJ subpoenaed medical records from Elmalech's treating physician for the 1993 to 1995 period, as none had been produced during the first hearing. Unfortunately, that was unavailing because Elmalech's doctor responded that he did not have any documents, that he had not treated Plaintiff in over ten years, and that he had "no memory of the issues that I am able to fill out [in] these forms." (R. 498). Unlike at the first hearing, medical expert Dr. Dougherty also appeared to assist the ALJ in assessing Elmalech's condition. He testified that the former listing 11.03 (epilepsy) was the closest listed impairment to Elmalech's condition. Dr. Dougherty stated that if Plaintiff's testimony were found credible (the credibility assessment carried out under SSR 96-7p was still in place at that time), then Elmalech's problems with dizziness would equal listing 11.03. That would necessarily require a finding that Plaintiff was disabled. The ALJ, however,

determined that Elmalech's testimony was not credible and denied her claim. She again appealed the decision to this Court. No decision was issued because the case was voluntarily remanded for more careful review.

Elmalech's third go-round with the SSA involved a new ALJ, who also called on a new medical examiner, Dr. Ashok Jilhewar. The result was different in some ways but the same in others. This time Elmalech's diabetes, hypertension, glaucoma, and vestibular disorder were not severe impairments, even though the former ALJ had twice determined that they met the minimal standard required for such a finding. Dizziness remained on the list, and Elmalech's severe impairments now included obesity as well. Dr. Jilhewar gave an RFC opinion for two time periods after Elmalech's last insured date of June 30, 1995 (whose scope the parties now construe differently) but did not opine about Plaintiff's work capacity during the alleged disability period. Noting that virtually none of the objective record addressed Plaintiff's condition during that time, the ALJ (1) rejected most of what Elmalech and the other witnesses testified to concerning Plaintiff's symptoms, (2) rejected the previous medical expert's opinion, (3) rejected (at least at times) Dr. Jilhewar's belief that Plaintiff's dizziness was not a severe impairment, (4) rejected the state-agency experts' opinions, (5) did not, or was unable to, elicit an RFC assessment from Dr. Jilhewar for Plaintiff's disability period, (6) yet found, as the earlier ALJ had, that Elmalech had the RFC to carry out light work with various exertional and non-exertional restrictions from June 1993 through June 1995.

At the heart of the ALJ's reasoning was the lack of relevant medical evidence. No contemporary records exist during the period between 1993 and 1995; only the testimony of Elmalech and various of her family members about what she experienced during that

time are present.  Indeed, after an astonishing seven administrative hearings of various lengths,[1] interrogatories sent to a treating physician, an evidentiary subpoena issued by the ALJ, and a record of nearly 2,000 pages, only *one* piece of medical evidence addresses the relevant time period directly:  a note from Plaintiff's former physician Dr. Herbert Lang stating that "Ms. Elmalech was a longstanding patient of mine in the 1980s – 1990s.  Old records could not be located.  I do remember she had major issues with chronic dizziness."  (R. 410).  And even that note – scribbled on a prescription pad in August 2008 – post-dates Elmalech's last insured date by 13 years.  The dismaying nature of such a situation merits serious reflection on the entire process of administering and adjudicating disability claims.  That is, of course, beyond the scope of this Court's task, which is limited to assessing the ALJ's nearly-metaphysical attempt to divine whether Elmalech met the criteria for disability in the remote past.  The ALJ undertook her obligation seriously and executed it in admirable detail.  Nevertheless, Elmalech is again entitled to remand so that she may try for the fourth time to persuade an ALJ that she was disabled between 23 and 25 years ago.

### A.    The Step 2 Analysis

Before addressing the issues raised by Elmalech, the Court briefly discusses on its own motion the ALJ's finding at Step 2 that Plaintiff's only severe impairments were obesity and a history of chronic dizziness.  The issue is not outcome-determinative because any error that arises at Step 2 is not reversible as long as the ALJ continues with the sequential analysis and considers all of a claimant's severe and non-severe impairments.  *Curvin v.*

---

[1]  Hearing were held on April 15, 2008, September 4, 2008, May 16, 2012, October 2, 2012, January 15, 2013, July 31, 2013, and May 10, 2016.

*Colvin*, 778 F.3d 645, 649-50 (7th Cir. 2015); *Arnett v. Astrue*, 676 F.3d 586, 591 (7th Cir. 2012) ("Deciding whether impairments are severe at Step 2 is a threshold issue only; an ALJ must continue on to the remaining steps of the evaluation process as long as there exists even one severe impairment."). The ALJ did so in this case. Nevertheless, the ALJ's Step 2 finding is based on unclear, and occasionally contradictory, reasoning that should be more logically stated in light of the remand that is necessary on the other grounds discussed below.

As noted above, the earlier ALJ found that Elmalech suffered from four severe disorders – a history of dizziness, a vestibular dysfunction, diabetes, and glaucoma. The new ALJ retained the history of dizziness, rejected the other three impairments, and added obesity. The vestibular disorder was the most pressing of the issues facing the ALJ. She was presented with two conflicting expert assessments concerning Elmalech's condition. The earlier expert Dr. Dougherty testified at the July 31, 2013 hearing that Elmalech's dizziness had signs of a migranoid origin and was vestibular in nature. (R. 571). The first ALJ relied on that to find that Elmalech suffered from the two different severe impairments of chronic dizziness and a vestibular disorder. Dr. Jilhewar disagreed with that conclusion at the May 2016 hearing. Citing tests of the inner ear carried out in 1999 and 2000, and records in 2003, he testified that Plaintiff's dizziness was not vestibular in nature. (R. 1002). The ALJ cited the tests that Dr. Jilhewar relied on, adopted his opinion at Step 2, and stated that "treatment records confirm that vestibular dysfunction has been explicitly been [sic] ruled out as the basis for her chronic dizziness." (R. 960).

The problem with that is that both Dr. Jilhewar and the ALJ failed to account for the full record. It is not true that a vestibular disorder was ruled out as the cause of Elmalech's

vertigo. Elmalech was also referred to therapy in 2013 following a diagnosis of "peripheral vestibular hypofunction" (R. 1526) – a disorder of the peripheral vestibular system in the inner ear. *See* www.neuropt.org/vsig-english-pt-fact-sheets/unilateral-vestibular-hypofunction.pdf (last visited Sept. 15, 2018). A vestibular oculomotor exam carried out on April 25, 2013 was positive upon a head thrust test. (R. 1527). In 2015, treating physician Dr. Elena Edwards diagnosed Elmalech with "severe paroxysmal vertigo." (R. 1616). Paroxysmal vertigo is a vestibular disorder. *See* https://www.ncbi.n.m.nihl.gov/pms/articles/PMC2719513 (last visited September 15, 2018). Plaintiff was prescribed "vestibular sedatives" to treat her symptoms. (R. 1564). Thus the record reflects a diagnosis of a vestibular disorder, together with treatment modalities for it. The ALJ could not adopt Dr. Jilhewar's opinion on this matter and reject Dr. Doughtery's without first noting Dr. Edwards' diagnosis and resolving the evidentiary conflict that exists on this topic.[2] *See Young v. Barnhart*, 362 F.3d 995, 1001 (7th Cir. 2004) ("Weighing conflicting evidence from medical experts, however, is exactly what the ALJ is required to do.").

In addition, the ALJ's assessment of Elmalech's chronic dizziness is self-contradictory on its face. Dr. Jilhewar testified at the May 2016 hearing that Plaintiff's

---

[2] The ALJ rejected testimony from Plaintiff and other witnesses on the vestibular issue, noting that objective medical evidence was necessary to establish the existence of a severe impairment. (R. 960 at n.2). Nevertheless, the ALJ had already called that standard into question by the time she cited it to reject Plaintiff's testimony. The ALJ found earlier at Step 2 that Elmalech was obese during the 1993 to 1995 period, even though "[t]here are no records of her BMI [body mass index] prior to the date she was last insured, June 30, 1995." (R. 959). Plaintiff's weight was not recorded until 1999. (R. 959). Thus, no "objective medical corroboration" (R. 960 at n.2) existed on this issue. Instead, the ALJ appears to have inferred that Plaintiff had been obese based on her subsequent medical records. The ALJ is instructed to uniformly apply the appropriate standard to all Step 2 issues on remand.

dizziness did not constitute an impairment, either severe or non-severe, prior to 2003. The ALJ agreed with that conclusion at one point in her decision. (R. 968, "I agree with Dr. Jilhewar, who opined that the claimant's chronic dizziness was not a medically determinable impairment before 2003"). Confusingly, the ALJ then disagreed with her own finding by stating at Step 2 that chronic dizziness *was* "a severe impairment before the claimant was last insured [in 1995])." (R. 960). The ALJ could not have it both ways; either she agreed with Dr. Jilhewar or she did not.[3] On remand, the ALJ should clarify the basis of her reasoning and explain more carefully how she evaluated what Dr. Jilhewar said concerning Plaintiff's history of dizziness.

### B.    The Symptom Evaluation

As noted earlier, Elmalech's medical records could not be located for her alleged disability period of 1993 through 1995. The only direct evidence of her condition was Dr. Herbert Lang's 2008 hand-written note that he treated her during that period and that she "had major issues with chronic dizziness." (R. 410). That left the testimony of Elmalech, her husband, and her daughter as the only other sources that the ALJ could draw on to make her decision. The ALJ recognized the unusual importance of this testimony, stating that "[t]he ultimate question I must resolve is the extent to which I credit the claimant's

---

[3]   The Commissioner states that the ALJ found that dizziness was a severe impairment because she gave Plaintiff the benefit of the doubt. (R. 968, "I give the claimant every benefit."). That suggests that the ALJ did so out of some form of judicial largesse. There is no evidence that the ALJ rejected her own expert's testimony merely because she was being generous to Elmalech; she specifically cited Dr. Lang's 2008 note at Step 2. (R. 960). ALJs frequently use the vague boilerplate phrase that they have given "every benefit" to a claimant. As noted above, however, the ALJ said that an impairment can be severe at Step 2 only if it is accompanied by "objective medical corroboration." (R. 960 at n.2). On remand the ALJ shall clarify the basis of her Step 2 reasoning.

allegations that she experienced dizzy spells" with such frequency and intensity that she was precluded from all work. (R. 964). That point was underscored in the earlier ALJ's second decision, in which he noted that, if the testimony were credited, then the medical expert Dr. Doughtery believed that Plaintiff would medically equal the former listing 11.03 (epilepsy). The second ALJ credited aspects of Elmalech's testimony concerning factors that triggered vertigo episodes such as pulmonary irritants, rapid head movements, and postural activities. Critically, however, she rejected Plaintiff's statements concerning the frequency and severity of her vertigo. The ALJ also rejected the testimony of Elmalech's husband and daughter in its entirety. Plaintiff contends that substantial evidence does not support the ALJ's finding. The Court agrees that the ALJ failed to evaluate the witnesses' statements adequately.

Plaintiff's daughter appeared at the first hearing held on April 15, 2008. She testified that her mother had stopped working as a restaurant cashier in 1993 due to ongoing vertigo. The restaurant was a family business co-owned by a partner. (R. 563-64). Plaintiff frequently left work early up to four days a week because of her dizziness. (R. 34). Elmalech needed to hold onto solid objects to keep from falling and had to sit down when vertigo spells began. (R. 34). These episodes varied in frequency from three to five days a week and lasted about 30 to 45 minutes each, though they could extend to a full hour. (R. 34). Dizziness was accompanied by head pain, ringing in the ears, and nausea, and it could be triggered by body or head movements as well as things crossing Plaintiff's line of sight. (R. 44-46). Elmalech became dizzy up to seven times a day by the time she stopped working, though her vertigo began in the 1980s. (R. 39-40). It became worse over time. (R. 41). Elmalech frequently needed to sit in a dark room until the vertigo

11

subsided. (R. 47).

Plaintiff appeared at the second hearing on September 4, 2008. Elmalech stated that her vertigo first emerged in the 1980s. (R. 423). Episodes can be triggered by focusing (she can only watch TV for one hour), from bending, or from no external cause at all. (R. 424, 425, 435, 450, 455). They can also come on merely from walking, a claim also made by her daughter. (R. 424). Elmalech agreed with her daughter that dizzy spells lasted around 45 minutes, though they could extend to an hour or an hour-and-a-half. (R. 427). This occurred every day during the disability period. (R. 427, 446). She needed to leave work several days each week because of vertigo. (R. 430). Currently, Plaintiff's days are filled largely by sitting at home. She shops about once a week for 30 minutes and drives for five minutes to the store. (R. 434). She or her husband also drive for 20 minutes to see her daughter and grandchildren. (R. 435). Plaintiff stated that her activities from 1993 to 1995 were largely the same as they were at the time of the hearing, though she visited her daughter more frequently in the past. (R. 439). Her symptoms became worse after 1995, however. (R. 440). Attacks are accompanied by head and neck pain as well as nausea. (R. 449). She has ringing in her ears at all times. (R. 440-41). She must sit in a dark room when the dizziness sets in. (R. 449). Environmental triggers include cleaning fluids and the presence of multiple moving persons as in a shopping mall. (R. 450-51). She can walk only five minutes at a time.

Plaintiff and her husband testified at the hearing on July 31, 2013. Plaintiff largely confirmed her earlier statements, though her driving had been reduced to three or four times a week. (R. 533). She had also stopped shopping. (R. 534). She does some ocular therapy for her vertigo attacks twice a day. (R. 537). Elmalech can only read for

12

five minutes before becoming dizzy. (R. 555). Mr. Elmalech testified that Plaintiff was dizzy "most of the time" during the disability period. (R. 563).

The ALJ was required to evaluate this critical set of statements pursuant to SSR 16-3p. However, she began her analysis by citing SSR 83-20, which concerns the onset of disability. (R. 964). The ALJ stated that SSR 83-20 required her "to infer the onset date from the medical and other evidence." (R. 964). That is presumably because SSR 83-20 states that when precise medical evidence is not available, the ALJ should call a medical expert at the hearing (as the ALJ did here) and attempt to make reasonable inferences about the onset of disability from the medical evidence that is present. If no inference can be made from that evidence, "it may be necessary to explore other sources of documentation" such as family members "to furnish additional evidence regarding the course of the individual's condition." SSR 83-20.

Plaintiff contends that the ALJ improperly conflated the guidance of SSR 83-20 with the standards set out in SSR 16-3p for evaluating a claimant's symptoms, thereby applying the wrong legal standard to this critical issue. That would necessitate an automatic remand because "if the ALJ commits an error of law such as incorrectly applying legal standards, reversal is required without regard to the volume of evidence in support of the factual findings." *Dominguese v. Massanari*, 172 F. Supp.2d 1087, 1094-95 (E.D. Wis. 2001). Notwithstanding its importance, the Commissioner has not responded to Elmalech's point. That may be because it is unclear what the ALJ actually used SSR 83-20 for. Plaintiff claims, and the ALJ appears to have thought, that she used the Ruling to determine the onset of Elmalech's two medical impairments, obesity and chronic dizziness. As Plaintiff notes, however, the ALJ had already found that obesity and dizziness had an onset date

13

of June 1, 1993 by the time the ALJ cited SSR 18-20.  The ALJ also appears to have used the Ruling as a basis for evaluating Plaintiff's testimony concerning the severity and frequency of her symptoms, as Plaintiff claims.  However, SSR 16-3p covers that issue.  By contrast, "SSR 83-20 addresses situations in which an ALJ finds that a person is disabled as of the date she applied for disability insurance benefits, but it is still necessary to ascertain whether the disability arose prior to an even earlier date[.]"  *Eichstadt v. Astrue*, 534 F.3d 663, 666 (2008).

That *may* have been what the ALJ was trying to do for some reason, but the ALJ was unclear, Plaintiff is vague, and the Commissioner is silent.  Whatever the ALJ intended, the Court disagrees that any error that may have ensued, even assuming any did, requires remand.  The ALJ did not apply the Ruling in a sustained way and never said that her decision was based on its standards.  Instead, she invoked SSR 83-20 at the start of her analysis only to quickly drop it and move on to the criteria set out in SSR 16-3p to evaluate Elmalech's testimony.  The ALJ considered, for example, Elmalech's activities of daily living ("ADLs"), medication and treatment history, and the consistency between her statements and the record that post-dated her disability period.  The Court therefore turns to the factors that the ALJ considered to decide if they meet the standard set out by SSR 16-3p and the regulations.

The result of such an analysis has given the Court considerable pause, particularly given that this was Elmalech's third appearance before an ALJ.  The ALJ thought that Elmalech's daily activities undermined her claim that dizziness and vertigo prevented her from working on a regular basis.  The ALJ did so, however, without accounting for the full record on the issues she cited.  She began by noting that Elmalech could drive 20 minutes

to the store and five minutes to her daughter's home well after her last insured date.  But Elmalech did not claim that she was home-bound by vertigo at all times.  She repeatedly testified that her dizzy spells were episodic and that she drove only when they had abated. (R. 560).  The ALJ overlooked Elmalech's clarification of this issue and never explained why driving under the conditions that Plaintiff described contradicted what she stated.  The ALJ also placed significant weight on what she characterized as Plaintiff's "active involvement" with her grandchildren.  The first ALJ raised the same point about Elmalech's involvement with her grandchildren at the September 2008 hearing.   The new ALJ did not specify what it was that Plaintiff allegedly did because, in reality, no evidence supports the ALJ's claim.   Elmalech's response to the first ALJ was clear.  She testified that when she visits her daughter she only sits and talks but does not go with the family to outdoor activities.  Other than sitting, "I don't do nothing."  (R. 435-36).  As for caring for the grandchildren, Plaintiff stated that she did not babysit them. "I don't take care of them, I go there. . . . I sit with them, but I don't take care of them."  (R. 442-43).  The ALJ suggested that Elmalech was so busy caring for her grandchildren that she did not even have time to carry out other important activities like meeting doctors' appointment.  Yet the ALJ erroneously overlooked everything that Plaintiff said on this topic.   "An ALJ has the obligation to consider all relevant . . . evidence and cannot simply cherry-pick facts that support a finding of non-disability while ignoring evidence that points to a disability finding." *Denton v. Astrue*, 569 F.3d 419, 425 (7th Cir. 2010).

One of the ALJ's central claims was that Elmalech's vertigo was "frequently stable" and that the activities just cited contradicted Plaintiff's claim that her vertigo was as serious from 1993 to 1995 as it was later.  (R. 966-67).  Without accounting for all that Elmalech

15

said, however, the ALJ had no basis for making those claims. That obligation extended to all aspects of Elmalech's testimony on her daily activities, most of which the ALJ ignored entirely. Plaintiff testified in 2008 that she goes shopping only once a week for one-half hour. (R. 434). By 2013, she stopped shopping entirely. (R. 523). She further stated that her household chores are minimal; Elmalech dusts "a little," does laundry if her husband carries it, and can vacuum for 15 minutes with a "very light" vacuum of one pound. (R. 438-39). She can only read for five minutes at a time and watch TV for an hour. (R. 451). Her daughter does all of Plaintiff's writing for her. (R. 452). She can walk for five minutes and stand for 20 to 30 minutes at a time. (R. 456). Her ability to lift is limited to three to five pounds. (R. 456). Even though Plaintiff's testimony was the most important evidentiary source for assessing Plaintiff's condition prior to June 1995 – indeed, the ALJ characterized it as the "only evidence" – the ALJ failed to take note of anything that Elmalech said on these issues. (R. 964). That merits remand in itself.

The ALJ's only reference to Plaintiff's ADLs was that she engaged in "regular walking" that allegedly contradicted her claim that walking increased her dizziness. The issue of walking arose several times in the course of this protracted case. It was never properly construed. The first ALJ insisted on more than one occasion that a physician had stated in 2003 that Plaintiff had been walking for a mile a day since the early 2000's and that it helped to control her dizziness. (R. 437). In support, the first ALJ cited an October 16, 2003 treatment note from Dr. Hoyee Chen. Its implications are not what the ALJ claimed, however. The note does state that Plaintiff had been walking a mile a day – though only for one month, not for years – but that doing so created pain in her feet. (R. 352). And far from claiming that walking helped to control dizziness, Dr. Chen said that

16

Elmalech complained that she was dizzy at the time of the October 2003 consultation, clearly implying that it did *not* help. (R. 352). The new ALJ properly ignored Dr. Chen's 2003 note in her discussion, but she also did not say what it was that supported a finding that Plaintiff had been engaging in "regular walking."

Notwithstanding, some of what the ALJ said about Elmalech's walking was correct. She noted that Plaintiff once told Dr. Chen that walking did not increase her dizziness, (R. 1407), and correctly interpreted that to contradict Elmalech's testimony that walking always made her condition worse. But that does not explain the ALJ's belief that Elmalech could do more than she claimed. The ALJ essentially inferred from one medical entry that Plaintiff could do "regular walking" at will over long periods of time. That is a very thin reed on which to hang a symptom analysis. The fact that Plaintiff once said that she could walk without increasing her vertigo does not mean either that she could do "regular walking" or that she could walk as the ALJ claimed over a multi-decade period. The record strongly suggests that Elmalech's condition was sporadic. The ALJ herself recognized that fact, but it is unclear how she applied it in this instance. SSR 16-3p recognizes the problem that can arise from the fact that a claimant's symptoms may not always be consistent. "[I]nconsistencies in an individual's statements made at varying times does not necessarily mean they are inaccurate. Symptoms may vary in their intensity, persistence, and functional effects, or may worsen or improve with time. This may explain why an individual's statements vary when describing the intensity, persistence, or functional effects of symptoms." Given the extraordinary importance of Plaintiff's testimony in this case, the ALJ should have considered more carefully the evidence that was relevant to the finding that Plaintiff could engage in "regular walking."

The ALJ also called Elmalech's testimony into question based on her medication history. The ALJ noted that some of Elmalech's doctors thought that her dizziness could be related to high blood pressure and that Plaintiff was not always consistent in taking her hypertension medication. She reached the same conclusion concerning Elmalech's compliance with her diabetes medication.[4] The ALJ stated that was one reason that weakened Plaintiff's claims. (R. 965, "At times, her symptoms have increased when she has been non-compliant with her hypertension and/or diabetes medications. At times, she reports symptoms improvement to her doctors. This undermines her allegations"). That is to say, the ALJ implicitly found that Elmalech's vertigo was at least partially her own fault. The ALJ also noted that Plaintiff's symptoms seemed to improve somewhat on medications such as lorazepam, which had been prescribed to ease her vertigo symptoms. The ALJ then twice criticized Plaintiff for not taking vestibular medication at earlier stages of her impairment. (R. 966, R. 968, "claimant took no ongoing medication . . . before 2003").

The ALJ's speculations on these issues are seriously misplaced. No physician made a firm link between Plaintiff's hypertension, diabetes, or her medication compliance with Elmalech's vertigo. Even the ALJ herself noted that hypertension medication "has also been ruled out as a factor" that contributed to Plaintiff's dizziness. (R. 966). That precluded the ALJ from trying to link compliance with hypertension and dizziness

---

[4] The ALJ later repeated the same allegation, stating that after 2003 "[h]er symptoms have since increased, as has her treatment, accompanied by worsening control of her diabetes and hypertension." (R. 967). Again, however, the ALJ did not cite any medical expert who definitively linked Elmalech's vertigo with diabetes or hypertension. The fact that Plaintiff's dizziness was associated from time to time with complications related to hypertension and diabetes does not mean that a causal link existed between them, as the ALJ implied. Certainly, she could not make that conclusion on her own because ALJs have no medical expertise.

medications, or those conditions themselves, as a ground for doubting Plaintiff's testimony, at least without firm medical evidence to support her non-expert guess. The same is true for Plaintiff's use of lorazepam. It is true that Elmalech was given lorazepam and Xanax for dizziness beginning in 2003 and that they provided some relief. But the ALJ's claim that Elmalech was less believable because she did not take these medications earlier assumes that they were appropriate for her condition in the first place. The record calls that into doubt. In January 2015, Elmalech was treated by Dr. Sam Marzo in the Department of Otolaryngology at Loyola University, who determined that her chronic dizziness "is likely multifactoral." (R. 1564). He noted that lorazepam seemed to help Elmalech's symptoms, but that "she should wean off her vestibular sedatives." (R. 1564). Unfortunately, The ALJ overlooked Dr. Marzo's entry, leaving it unexplained why Plaintiff should have been taking lorazepam at an earlier point when a vertigo specialist told her to discontinue it even though it ameliorated her symptoms. The ALJ was not entitled to substitute her unqualified medical opinion on what medications Plaintiff should have been taking without first accounting for Dr. Marzo's expert opinion. *See Dixon v. Massanari*, 270 F.3d 1171, 1177 (7th Cir. 2001) (explaining that an ALJ may not substitute her own opinion for a physician's without relying on other medical evidence or authority in the record); *Rohan v. Chater*, 98 F.3d 966, 970 (7th Cir. 1996).

Part of the ALJ's problem, of course, involves the fact that no medical records exist during the 1993-1995 disability period, other than Dr. Lang's 2008 note that she had "major issues" with vertigo. (R. 410). As discussed above, the issue was not that Elmalech did not seek treatment during that period but that Dr. Lang's treatment notes had been lost by the time she filed her disability claim. The ALJ, however, had serious concerns about

19

Elmalech's treatment history after her last insured date. She correctly pointed out that the first relevant evidence concerns a 1996 cardiac stress test that had to be aborted when Plaintiff became too dizzy to complete it. Neuro-vestibular testing took place in 1999. The ALJ said that Elmalech then received no treatment or medication for her condition until 2003, when her symptoms began to worsen. Not surprisingly, the ALJ expressed concern about what appears to be gaps in treatment. (R. 966-67, "Thus, there are significant gaps in time between complaints of severe symptoms and treatment, which undermines the claimant's testimony about the frequency and severity of her symptoms since before her date last insured, June 30, 1995").

The ALJ's focus on this issue was not only reasonable, it was critically important to a case in which almost everything revolves around Plaintiff's testimony decades after her onset date. That made it incumbent on both ALJs in this case to ask Elmalech the common-sense question of why she did not seek out more consistent or aggressive treatment if her vertigo was as disabling as she said it was. Unfortunately, neither of them did so. That was erroneous. SSR 16-3p (like SSR 96-7p which it replaced) could not be more clear concerning the ALJ's duties on this issue. A claimant's symptoms may not be as severe as she claims if the frequency or extent of her treatment does not match the degree of her complaints. Nevertheless:

> We will not find an individual's symptoms inconsistent with the evidence in the record on this basis without considering possible reasons he or she not comply with treatment or seek treatment consistent with the degree of his or her complaints. We may need to contact the individual regarding the issue of treatment or, at an administrative proceeding, ask why he or she has not complied with or sought treatment in a manner consistent with his or her complaints.

SSR. 16-3p. The Ruling goes on to cite ten possible lines of inquiry on this topic, none of which were addressed here. Courts have repeatedly stated that an ALJ "must not draw any inferences about a claimant's condition from this failure [to pursue treatment] unless the ALJ has explored the claimant's explanations as to the lack of medical care."[5] *Craft*, 539 F.3d 668, 679. *See also Roddy v. Astrue*, 705 F.3d 631, 638 (7th Cir. 2013); *Shauger v. Astrue*, 675 F.3d 690, 696 (7th Cir. 2012) ("Although a history of sporadic treatment or the failure to follow a treatment plan can undermine a claimant's credibility, the ALJ must first explore the claimant's reasons for the lack of medical care before drawing a negative inference.").

Along similar lines, the ALJ noted that Elmalech did not file her disability application until January 18, 2007. The ALJ thought that was "not inconsistent" with increases in symptoms of dizziness after 2003. (R. 967). The ALJ's implication was clear – the fact that Elmalech did not file her application earlier suggests that her symptoms were not as frequent or severe as she claimed they were during the disability period. That is a reasonable, indeed an important, issue: if Plaintiff's condition was as bad as she claimed from 1993 to 1995, why did she wait until 2007 to file for disability? Again, however, the ALJ never asked Elmalech to address that question. The ALJ was not entitled to draw negative inferences from the date of Elmalech's filing without first giving her an opportunity

---

[5] The witnesses testified that Elmalech pursued other medical treatments, including trips to the ER. These were not produced, and no evidence suggests that they were unavailable as Dr. Lang's were. The ALJ was entitled to construe the absence of these documents against Plaintiff because she bore the burden to produce all medical evidence that was relevant to her claim. Given the tortured evidentiary problems in this case, however, the ALJ should have asked Plaintiff or her counsel why they had not been obtained before using them to cast doubt on the testimony of Elmalech and her relatives.

to explain why she waited until 2007 to do so.

The Commissioner defends the ALJ's decision by claiming that this case is analogous to *Eichstadt*, *supra*. In *Eichstadt* the claimant stopped working in 1986, was diagnosed with fibromyalgia in 1999, and filed her disability claim in 2003. As here, the claimant was able to obtain little or no information about her condition before her last insured date of December 31, 1987, and nothing indicated that Eichstadt even suffered from fibromyalgia prior to that date. The ALJ rejected Eichstadt's disability claim and found her testimony concerning her condition to be less than credible under SSR 96-7p. That credibility finding was based on the lack of evidence available about Eichstadt's condition prior to her last insured date in December 1987. *Eichstadt*, 534 F.3d at 668. The Seventh Circuit approved the ALJ's reasoning. *Id*. ("The record supports this assessment; indeed, it is hard to imagine what else the ALJ could have done.").

The Commissioner claims that *Eichstadt* means that the ALJ in this case was justified in discounting Elmalech's testimony because of the lack of contemporaneous medical evidence of her condition. The Court agrees that the evidentiary issue was highly relevant, but the facts of this case are not identical to those in *Eichstadt*. In *Eichstadt*, the ALJ based her credibility finding on the fact that no evidence reflected the claimant's condition during the remote disability period. The ALJ also concluded that the evidence that post-dated the last insured dat was irrelevant. *Id*. Neither of these conditions fully applies here. The ALJ in this case did not base her symptom evaluation solely on the missing evidence from 1993 and 1995. Nor did she dismiss the post-1995 evidence as irrelevant. Instead, she evaluated the evidence that reflected Elmalech's condition after

1995 under the factors set out in SSR 16-3p and concluded that the result of that analysis prevented her from inferring that Elmalech's symptoms were as serious between 1993 and 1995 as she claimed. That was why the ALJ said that evaluating Elmalech's testimony posed the "ultimate question" of the case. (R. 964). Unlike in *Eichstadt*, therefore, the symptom evaluation in this case was made "absent any supporting evidence of any nature, *and* in light of the significant subsequent evidence to the contrary." (R. 967) (emphasis added). The entire thrust of the ALJ's reasoning was based on trying to decide if an analysis of symptoms under SSR 16-3p could be construed to shed light on the past. If the ALJ thought that the issue could have been determined *solely* on the absence of contemporaneous evidence, then why did she bother undertaking the elaborate symptom analysis described above? Having set out on that path, however, the ALJ was obligated to follow the directives of SSR 16-3p with care.

Contrary to the Commissioner's suggestion, moreover, this is not a case like *Eichstadt* in which no evidence at all existed concerning the claimant's condition during a remote disability period. The ALJ accepted Dr. Lang's 2008 note to find that chronic dizziness constituted a severe impairment throughout the 1993 to 1995 period. The note was not much, but the ALJ said it was sufficient medical evidence to find that a severe impairment existed. That has implications on what the ALJ could do. "[O]nce the claimant produces medical evidence of an underlying impairment, the Commissioner may not discredit the claimant's testimony as to subjective symptoms merely because they are unsupported by objective evidence." *Carradine v. Barnhart*, 360 F.3d 751, 753 (7th Cir. 2004) (quoting *Lester v. Chater*, 81 F.3d 821, 834 (9th Cir. 1996)). *See also See Beardsley*

*v. Colvin*, 758 F.3d 834, 837 (7th Cir. 2014) ("Whatever certainty may exist around such self-reports is not by itself reason to discount them – otherwise, why ask in the first place?"); Burch v. Barnhart, 400 F.3d 676, 680 (9th Cir. 2005).   As *Carradine* points out, unverifiable subjective complaints may be all the ALJ has to go on at times.   *Carradine*, 360 at 754 (citing fatigue and pain) (internal quote and citation omitted).

One of the central problems in this case is that it is exceptionally difficult to follow the basis of the ALJ's analysis of the evidentiary problem.   Clearly, she used the lack of contemporaneous medical evidence against Plaintiff, stating on several occasions that she did not fully credit Elmalech or her relatives because their testimony was "uncorroborated." (R. 967).   The absence of contemporary evidence was a serious and legitimate concern to the ALJ.   But the fact that the issue was relevant did not exempt the ALJ from articulating her reasoning with basic clarity and logic.   Unfortunately, it is not always clear whether the ALJ meant that Plaintiff's claims were uncorroborated by post-1995 evidence or that they were uncorroborated by pre-1995 records.   She clearly relied on the latter fact at times.   And even though she had every right to raise the issue, the ALJ appears to have been doing two things at the same time.   The ALJ knew from the start that no contemporaneous medical records existed; that was the very premise for undertaking a lengthy analysis of Elmalech's symptoms after 1995 under the standard of SSR 16-3p. But if the missing records during 1993-1995 were going to be brought back at the end to reject what the witnesses said, then why did the ALJ undertake the symptom evaluation at all? She could have said upfront that nothing supported Elmalech's claims about her condition 25 years ago.

Whatever the ALJ intended, two problems undermine her analysis.   First, the ALJ's

24

application of SSR 16-3p is seriously flawed for the reasons discussed above.  Second, the ALJ applied the lack of contemporary evidence to reject Plaintiff's testimony in an inconsistent manner.  The ALJ accepted some of what Elmalech stated even though no confirming evidence was available.  She found, for example, that Plaintiff could not work around pulmonary irritants because Elmalech testified that they triggered episodes of vertigo.  (R. 963-64).  The ALJ cited nothing to support that conclusion, ignoring the lack of corroborating records from the 1993 to 1995 period and accepting Plaintiff's testimony on its face value.  That leaves it completely unexplained why she rejected other things that Elmalech said about the frequency and severity of her symptoms.  If some self-reports could not be accepted because they were uncorroborated, then the ALJ was required to explain why she adopted others in the RFC that were equally unconfirmed.  Since the ALJ did not cite any medical evidence to support the statements that she credited, and did not explain the basis of her reasoning, she failed to draw a logical bridge between what she believed and disbelieved about Elmalech's testimony.  That requires remand.  *See Villano v. Astrue*, 556 F.3d 558, 562 (7th Cir. 2009) (noting that an ALJ is always required "to build a logical bridge between the evidence and his conclusion" that a claimant's testimony is not credible); *Aranda v. Berryhill*, 312 F. Supp.3d 685, 689-90 (N.D. Ill. 2018) ("Even if the court agrees with the ultimate result, the case must be remanded if the ALJ fails in his or her obligation to build that logical bridge.").

### C.    The RFC Issue

Elmalech next claims that substantial evidence does not support the ALJ's RFC analysis.  Or at least she says that is what her claim is.  In reality, Plaintiff challenges the

ALJ's finding that the testimony of the expert who appeared before the first ALJ, Dr. Doughtery, deserved no weight, and that Dr. Jilhewar's testimony at the final administrative hearing in 2016 merited the greatest weight. Not surprisingly, the Commissioner interprets Plaintiff's opposition to the RFC to concern only the weights the ALJ assigned to these testifying experts. The Court addresses those matters below, but the larger issue in this lengthy case involves the RFC itself. The Court easily concludes that the ALJ's assessment of Plaintiff's work capacity is erroneous on multiple fronts. A reviewing court may *sua sponte* address issues in social security cases. *See*, *e.g.*, *Wenzlick v. Astrue*, 2009 WL 2777711, at *2 (E.D. Mich. Aug. 28, 2009) ("Several courts have found that a reviewing case may order remand *sua sponte*.") (citing cases); *Womack v. Astrue*, 2008 WL 2486524, at *5 (W.D. Okla. June 19, 2008) (citing cases). The Court therefore discusses the RFC in broader terms on its own motion.

As noted earlier, the ALJ said that during the alleged disability period from 1993 through 1995, Elmalech could carry out light work as long as various exertional and non-exertional limitations were put in place. The Court is at a complete loss to follow the reasoning that led the ALJ to such an assessment.[6] She referred to her thought process

---

[6] The hearing testimony does not shed any light on the issue. The ALJ posed her hypothetical RFC to the vocational expert before either Dr. Jilhewar or Plaintiff testified. (R. 985). Her attitude to the topic has given this Court pause. The ALJ described to the vocational expert an individual restricted to light, unskilled work, then continued with the following description of her limitations: "*And here's my favorite*, she cannot watch items that move rapidly across her perpendicular line of sight such as a conveyer belt; no perpendicular vision like conveyor belt; nor can she rapidly move her head from side to side. And I will tell you just for fun that another job – okay." (R. 985-86) (emphasis added). The ALJ's statements then wandered off into other issues. The ALJ may have meant by the last remark to refer "for fun" to the fact that the ALJ herself had once worked in a cafeteria, like Plaintiff, while she was in college. (R. 986). Nevertheless, the Court reminds the ALJ that describing a hypothetical individual's work restrictions to a vocational expert, which is ordinarily done in the presence of the claimant, is not an opportunity for levity in which one of the claimant's unusual symptoms should be cited as a source of amusement. (R.

on this topic three times.  The ALJ began by stating that the RFC was "based on my review of the entire record."  Second, she concluded by claiming that no evidence existed "that would preclude work within the residual functional capacity assessed through the date she was last insured."  (R. 963, 968).  Neither of these boilerplate remarks explains anything meaningful about why the ALJ believed that Elmalech could perform light work.  The ALJ summarized the record, though she overlooked important ADL evidence as discussed above.  Merely summarizing the record, however, is not in itself a substitute for an ALJ's duty to explain the basis of the RFC.  *See Broadnax v. Berryhill*, 2017 WL 4263996, at *4 (N.D. Ill. Sept. 26, 2017)*; Williams v. Colvin*, 2016 WL 6804583, at *6 (N.D. Ill. Nov. 17, 2016).

Third, the ALJ made the following comment about how she arrived at the RFC decision.  "Although I agree with Dr. Jilhewar, who opined that the claimant's chronic dizziness was not a medically determinable impairment before 2003, I assess the slightly more restrictive limitations assessed by the prior ALJ in recognition of the claimant's history of chronic dizziness."  (R. 968).  That constitutes no reasoning at all.  Indeed, the ALJ's claim that she agreed with Dr. Jilhewar that dizziness was not a severe impairment makes no sense.  As discussed earlier, she plainly disagreed with Dr. Jilhewar at Step 2 by finding that such an impairment existed beginning in 1993.  If the ALJ actually thought that dizziness was not an impairment during the alleged disability period, why did she assess any vertigo-related RFC restrictions at all?  Assuming for the sake of argument that the ALJ *did* agree with Dr. Jilhewar, it is impossible to decide why she referred to the former ALJ's

---

986, "And here's my favorite").

RFC.  The ALJ seems to have thought that she could merely adopt what the earlier ALJ said without providing any independent reasoning of her own.  That fails to recognize that (1) the earlier RFC was based on the premise that Plaintiff suffered from four severe impairments, including a vestibular disorder that the new ALJ said was not even a non-severe impairment, and more importantly, (2) the Appeals Council vacated the earlier ALJ's decision.  (R. 1120).  There was nothing for the ALJ to adopt, incorporate, or rely on to assess the RFC.

The ALJ's task was to undertake a fresh analysis and to explain the basis of her reasoning for each of the RFC restrictions.  SSR 96-8p instructs ALJs that the RFC "must include a narrative discussion describing how the evidence supports each conclusion, citing specific medical facts . . . and nonmedical evidence."  The latter includes items such as the claimant's ADLs.  As noted above, the ALJ did not properly account for Elmalech's daily activities.  She misstated what Plaintiff described concerning her care for her grandchildren and failed to discuss Elmalech's statements about her limited ability to lift and carry out household chores.  Plaintiff said, for example, that she could only lift up to five pounds.  The ALJ's RFC meant that she could lift up to 20 pounds.  *See* 20 C.F.R. 404.1567(b) (describing light work).  In light of the ALJ's flawed account for Elmalech's daily activities discussed earlier, the Court is unable to discern how the ALJ decided anything about what Elmalech could do.  "As far as the Court can tell, the RFC is independent of any assessment or record."  *Kelly v. Colvin*, 2015 WL 4730119, at *8 (N.D. Ill. Aug. 10, 2015).

The ALJ cited no medical source for the RFC because none existed.  The ALJ rejected the state-agency reports and Dr. Dougherty's testimony at the July 2013 hearing.

That left the second testifying expert, Dr. Jilhewar.  He stated that Elmalech was limited to sedentary work from September 1996 through 1999, and that she was again capable of sedentary work from 2003 to 2007.  (R. 1010).  Dr. Jilhewar did not express any opinion about what Elmalech could do during her alleged disability period.  Thus, the ALJ had no medical testimony from the 2016 hearing on which to draw.  That did not necessarily preclude the ALJ from assessing the RFC properly.  The RFC formulation is for the ALJ to make as the finder of fact, though she must consider both medical and nonmedical evidence.  *See* SSR 96-8p.  What an ALJ cannot do, however, is fail to explain how she reached her decision.  *See Norris v. Astrue*, 776 F. Supp.2d 616, 638 (N.D. Ill. 2011).  *See also Briscoe ex rel. Taylor v. Barnhart*, 425 F.3d 345, 353 (7th Cir. 2005) (stating that the omission of a narrative discussion is sufficient to warrant the reversal of the ALJ's decision).

As part of her discussion, the ALJ was required to assess the testimony of the two medical experts in this case, Dr. Dougherty and Dr. Jilhewar.  The key difference between the two experts' testimony involved whether Elmalech's earlier condition could be inferred from the later medical evidence.  Dr. Doughtery testified that, if Plaintiff's  testimony were accepted, she would equal listing 11.03.[7]  He also stated that in his expert opinion Elmalech's testimony concerning the severity and frequency of her symptoms was

---

[7]  Some confusion exists on this issue.  Dr. Doughtery stated that the former listing 11.03 (epilepsy) was the most closely analogous listing for Plaintiff's condition, which meant that she would equal, rather than meet, it if the appropriate criteria were met. *See* SSR 17-2p.  The first ALJ asked if Elmalech would "equal" listing 11.03, but the expert responded that she would "meet" it. (R. 576).  He almost certainly intended to say that she would equal it, since there was no evidence that Plaintiff suffered from epilepsy itself.  The ALJ in this case misconstrued Dr. Doughtery's testimony to mean that "Listing § 11.03 <u>might</u> be equaled if the ALJ found the claimant's subjective allegations were credible."  (R. 962).  Dr. Doughtery clearly stated that Elmalech "would" meet the listing if the ALJ accepted her testimony.

consistent with the record. (R. 576). This was critical testimony for the ALJ. At the last hearing, she asked Dr. Jilhewar if Plaintiff suffered from the same frequency and severity of dizziness episodes during her disability period as she did at later times documented in the record. Dr. Jilhewar said he had no basis for saying that was true in light of the missing records. (R. 1020). That left the ALJ with two conflicting opinions from equally-qualified experts that she was obligated to resolve. *See Briscoe ex rel. Taylor*, 425 F.3d at 351; *Hardwick v. Astrue*, 782 F. Supp.2d 1170, 1180 (E.D. Wash. 2011); *Young*, 362 F.3d at 1001; *Hodes v. Apfel*, 61 F. Supp.2d 798, 808-09 (N.D. Ill. 1999) ("If conflicting medical evidence is present, the SSA has the responsibility of resolving the conflict[.]") (internal quotes and citation omitted).

The Court is unable to follow the basis of the ALJ's reasoning for favoring Dr. Jilhewar. The ALJ said in broad terms that she adopted his opinion because it was supported by the record. Again, however, the ALJ's mere reliance on her evidentiary summary does not adequately explain why she agreed with Dr. Jilhewar. *See Larson v. Colvin*, 26 F. Supp.3d 798, 811 (N.D. Ill. 2014) ("[The ALJ] could not simply summarize the evidence and say it didn't support Mr. Larson's allegations. Just as an expert's *ipse dixit* is not acceptable . . . neither is an ALJ's. That is the whole point of the logical bridge requirement."). That is especially true here, where the ALJ did not always grasp how the record related to Dr. Jilhewar's testimony. The ALJ did not appear to recognize that she had, in fact, agreed with Dr. Doughtery – not Dr. Jilhewar – on whether Elmalech's chronic dizziness constituted an impairment from 1993 through 1995. And as noted earlier, the ALJ failed to grasp that the record seems to support Dr. Doughtery – not Dr. Jilhewar – that

Elmalech suffered from a vestibular disorder. As part of that issue, it is not clear that the ALJ or Dr. Jilhewar fully understood the results of the 1999 and 2000 ENG [electronystagmography] test that they both cited to claim that no vestibular disorder existed. The ALJ said that both tests were "normal" "well past her date last insured." (R. 960). Dr. Jilhewar also tried to claim that no vestibular disorder existed because part of the ENG involved a caloric test in which water is placed in the ear. (R. 1000). But the two ENG test results in question both state that the caloric test was not carried out at the request of Elmalech. (R. 221-24). In fact, Plaintiff had to interrupt Dr. Jilhewar to tell him that she could not undergo that part of the test, though no one bothered to ask her why that was the case. (R. 1000). By contrast, Dr. Doughtery recognized what the ENG test results actually stated. (R. 578). Nevertheless, the ALJ dismissed his testimony by claiming that it was "based solely on uncorroborated testimony." (R. 960). The ALJ never properly explained why the same standard did not apply to Dr. Jilhewar.

Simply summarizing the record and saying that she favored Dr. Jilhewar does not satisfy the ALJ's obligation to build a logical bridge between the record and the her conclusion. The ALJ did not have provide more than a minimal articulation of why she favored Dr. Jilhewar on this issue, but she did have to say something that allows the Court to follow the basis of her reasoning.

## IV.  Conclusion

For the reasons stated above, Plaintiff's Motion for Summary Judgment [18] is granted, and the Commissioner's Motion for Summary Judgment [22] is denied. The Commissioner's decision is remanded to the Social Security Administration under sentence four of 42 U.S.C. § 405(g) for further proceedings consistent with this opinion. On remand,

the ALJ shall (1) reconsider whether Plaintiff had the severe impairment of a vestibular disorder, (2) reconsider the evaluation of the testimony of Plaintiff, her husband, and her daughter, (3) explain more carefully the reasons that support the RFC, and (4) restate the reasons for the weights assigned to the testifying medical experts.

ENTER:

DANIEL G. MARTIN
United States Magistrate Judge

Dated: September 26, 2018